UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-24180 CIV- KING
MAGISTRATE JUDGE : MCALILEY

MARIA BARQUIN; NATASHA WATSON; JESSICA OLIVER; LUCIANA LOCOBARA ; JASMINE TELSIE; and NATALIA PENA-MONSIEVHAN
Plaintiffs
vs.
MONTY'S SUNSET, LLC..
Defendant

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Monty's Sunset, L.L.C., ("Monty's Sunset" or "Defendant"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56 and Local Rule 7.5 , moves for summary judgment on all of Plaintiffs' claims, and in support thereof states:

1. There exists no genuine dispute of material facts as to the issues raised herein and Defendant is entitled to judgment as a matter of law.

2. The Memorandum of law incorporated herein shows that the claims raised in Counts I and II of the Complaint completely lack legal and factual support and accordingly must be dismissed.

**WHEREFORE** Defendant respectfully requests that this Motion for Summary Judgment GRANTED and Judgment be entered for Defendant.

**MEMORANDUM OF LAW**

**I**
**INTRODUCTION**

This is an action arising under 29 U.S.C. Sec. 215(a)(3). Plaintiffs allege they were terminated by Defendant in retaliation for verbal complaints to their employer related to their rights under the Fair Labor Standards Act ("FLSA") in violation of the anti-retaliation provisions thereof.

The FLSA requires covered employers pay minimum wage and overtime compensation to their non-exempt employees. 29 U.S.C. Sec. 201 et. seq.. In this action Plaintiffs do **not** allege Defendant failed to pay them minimum wage or overtime compensation pursuant to the FLSA. Plaintiffs do allege they were retaliated against for asserting such rights. Complaint at para. 12.

For Plaintiffs to prevail on their FLSA retaliation claim they must prove:

(1) they each engaged in a protected activity under the FLSA;

(2) they each subsequently suffered adverse action by the employer; and

(3) a causal connection existed between the protected activity and the adverse action.

Wolf v. Coca-Cola, 200 F.2d 1337, 1342-1343 (11th Cir. 2000)(citing Richmond v. ONEOK, Inc., 120 F.3d. 205, 208-09 (10th Cir. 1997). For the reasons set forth herein, Plaintiffs can not establish they engaged in activity protected by the FLSA or that a casual connection existed between any alleged protected activity and any adverse

action.

In addition to the FLSA retaliation claim in Count I of the Complaint, Count II of the Complaint purports to raise a state law claim Defendant interfered with Plaintiffs' business relationship with Defendant's customers by not allowing them to receive tips. Complaint at para. 13. For the reasons set forth herein, Plaintiffs can not establish they had a business relationship with Defendant's customers, that Defendant prohibited their receipt of tips, or that Defendant was a stranger or third party to any alleged business relationship they had with Defendant's customers.

In support of Defendant's Motion it submits the following Exhibits:

1. Exhibit 1- Defendant's First Interrogatories to Plaintiffs.
2. Exhibit 2- Plaintiffs' Response to Defendant's First Interrogatories to Plaintiffs.
3. Exhibit 3- Affidavit of Laurie Powell (with Exhibits A-C).
4. Exhibit 4- Affidavit of Tricia Johnson (with Exhibits A-C).
5. Exhibit 5- Affidavit of James Recio.
6. Exhibit 6- Affidavit of Martin Cabrera.
7. Exhibit 7- Affidavit of Irina Zevallos.
8. Exhibit 8- Affidavit of Amanda Diaz.
9. Exhibit 9- Statement of Material Facts

## II
## FACTS

Defendant Monty's Sunset, L.L.C. (hereinafter "Monty's Sunset") is the owner of the Monty's restaurant located on Miami Beach, Fl.. It acquired that restaurant on September 23, 2011, from a completely unrelated entity. Affidavit of Tricia Johnson (the "Johnson Affidavit") Exhibit 4 hereto at para. 4. Prior to acquiring Monty's, as part of their due diligence process, the owners of Monty's Sunset, Tricia and Matt Johnson, fully and completely reviewed the business operations of the restaurant. One aspect of the business operations investigated by the Johnsons was the method by which employees were paid and the legal compliance of those payment procedures. Johnson Affidavit at para. 5-6.

At a meeting held at the restaurant on September 23, 2011, Plaintiffs (other than Plaintiff Pena-Monsievich who was hired thereafter) and all Monty's Miami Beach employees were informed the restaurant had been sold and they were no longer employees of the former owner. All former employees were offered a position with Monty's Sunset upon the same terms as they benefited from with the prior owners. Affidavit of Laurie Powell (the "Powell Affidavit") Exhibit 3 hereto at para. 18-21; Affidavit of Amanda Diaz (the "Diaz Affidavit") Exhibit 8 hereto at para. 23; Johnson Affidavit at para. 18. Laurie Powell, the General Manager of Monty's Miami Beach for the prior owners, conducted the September 23 employee meeting and personally provided the Employee Handbook to Plaintiffs (other than Plaintiff Pena-Monsievich who was hired thereafter). Powell Affidavit at para. 19; Diaz Affidavit at para. 23.

Amanda Diaz, was a Manager for the prior owners who was hired by Monty's Sunset on September 23, 2011. Diaz Affidavit at para. 23. Ms. Diaz was in attendance at the September 23, 2011, meeting and observed Ms. Powell providing all employees, including Plaintiffs (other than Plaintiff Pena-Monsievich who was hired thereafter), with the Monty's Sunset Employee Handbook. Id.

At that meeting employees were required to sign a "Receipt and Acknowledgment Of Employee Handbook" for the Monty's Sunset Employee Handbook (the "Monty's Sunset Employee Handbook"). Powell Affidavit at para. 20; Diaz Affidavit at para. 23. Plaintiffs (other than Plaintiff Pena-Monsievich who was hired thereafter) did in fact sign the "Receipt and Acknowledgment Of Employee Handbook" on September 23, 2011, and accepted employment at that time. Exhibit A to Powell Affidavit. The "Receipt and Acknowledgment of Employee Handbook" signed by Plaintiffs stated "I received and will read my copy of Monty's Employee Handbook." Id.

Monty's Sunset continued the way RMI paid front of the house employees (servers, bartenders, bussers and food runners) by paying them 18% of their net sales, subject to enumerated deductions, with a wage guaranty of $11.51 per hour. Powell Affidavit at para. 18; Johnson Affidavit at para. 19; Diaz Affidavit at para. 24. The method by which Servers and Bartenders were paid by Monty's Sunset is set forth in the Monty's Sunset Employee Handbook at p. 5, where it states:

> All front of the house employees are guaranteed $11.51 per hour, for each hour worked, regardless of hours worked, after your payouts to support staff (5.0% of your net sales) credit card deductions (2.5% of your credit card sales), but **before** deductions for taxes.

Exhibit B to Powell Affidavit.

In addition to being described in the Monty's Sunset Employee Handbook, the method by which Monty's Sunset paid its Servers and Bartenders including the wage guaranty was verbally explained to them. Affidavit of Martin Cabrera (the "Cabrera Affidavit") Exhibit 6 hereto at para. 16; Diaz Affidavit at para. 27. In the kitchen area on a wall reserved for posting communications with employees Monty's Sunset posted the required Fair Labor Standards Act Poster. This Poster was displayed in the same area employee schedules were posted. That Poster in large print indicated the Federal Minimum Wage was $7.25. Johnson Affidavit at para. 15; Affidavit of James Recio (the Recio Affidavit") Exhibit 5 hereto at para. 18; Cabrera Affidavit at para. 17.

In the event a Server or Bartender earned less for a week than the guaranteed amount of $11.51 per hour, Monty's Sunset would pay the employee an additional amount to assure the employee was paid not less than the guaranteed amount. Powell Affidavit at para. 12; Recio Affidavit at para. 48 & 52. Plaintiffs Watson and Telsie were in fact paid additional amounts to bring their weekly pay up to the $11.51 wage guaranty. That was disclosed on their pay stub as a Labor Difference. Id. They accepted such additional payments without question or objection. Exhibit C to Johnson Affidavit (pay records).

Plaintiff Barquin earned not less than $11.94 per hour or 164% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $16.11 per hour or 222% of the minimum wage. Exhibit C to Johnson Affidavit; Recio Affidavit at para. 46. Plaintiff Watson earned not less than $11.51 per hour or 160% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $17.45 per hour or 240% of the minimum wage. Exhibit C to Johnson Affidavit; Recio Affidavit at para. 64. Plaintiff Telsie earned not less than $12.32 per hour or 169% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $17.37 per hour or 239% of the minimum wage. Exhibit C to Johnson Affidavit; Affidavit of James Recio, para. 65. Plaintiff Locobara earned not less than $14.93 per hour or 204% of the minimum wage during her entire period of employment, with her average pay for her entire employment with

Monty's Sunset being $17.84 per hour or 246% of the minimum wage. Exhibit C to Johnson Affidavit; Recio Affidavit at para. 61. Plaintiff Pena-Monsievich never earned less than $14.83 per hour or 204% of the minimum wage during any work week working for Monty's Sunset, at a time when the Federal Minimum Wage was $7.25 per hour. Exhibit C to Johnson Affidavit; Recio Affidavit at para. 83 .

In addition to the amount paid to Servers and Bartenders by Monty's Sunset, Servers and Bartenders were given tips by customers. Servers and Bartenders would receive both credit card tips and cash tips. Cabrera Affidavit at para.12; Recio Affidavit at para. 10; Diaz Affidavit at para. 46. When a tip would be given to a Server or Bartender they would keep that tip. Cabrera Affidavit at para. 12; Recio Affidavit at para 11; Diaz Affidavit at para. 47.

Monty's Sunset included an 18% Service Charge on all checks. It therefore required Servers and Bartenders to disclose this to customers. Exhibit B to Powell Affidavit; Johnson Affidavit at para. 28; Recio Affidavit at para 11; Diaz Affidavit at para. 48. The Monty's Sunset Employee Handbook at p. 6 states:

> TAGGING CHECKS
> An automatic 18% Service Charge is included in each check, with the exception of "To Go" orders which is automatic 10%. You are not allowed to add an extra service charge to the check or tell the guest that the service charge is not included. If a guest wants to leave an extra service charge, you must advise your immediate supervisor and have him/her authorize the extra service charge while the customer is still on the premises. Failure to follow this procedure will result in forfeiture of the extra service charge.

Exhibit B to Powell Affidavit.

One change made by Monty's Sunset was the way credit card receipts were prepared. Initially, guest checks contained a line item for the 18% Service Charge but the credit card receipt did not. This led to numerous customer complaints about their erroneously or mistakenly leaving to large an additional tip for Servers and Bartenders. Managers were spending too much time dealing with these problems and ownership was displeased with the unhappy customers and charge backs. To address this customer relations problem on December 28, 2011, a new system ( the Aloha system) was installed to prepare credit card receipts. The receipts were changed to specifically contain a line item showing the 18% Service Charge. Once this was done and when Managers began counseling employees concerning the "TAGGING CHECKS" provision of the Employee Handbook, the number of customer complaints was significantly reduced. Exhibit "A" to Johnson Affidavit shows the change in credit card receipts. Johnson Affidavit at para. 27-32; Recio Affidavit at para. 13; Cabrera Affidavit at para. 8.

Another change made on December 28, 2011, as part of the Aloha system installation was a reduction in the percentage of net sales paid to Servers and Bartenders. Prior to the Aloha system (pre December 28, 2011) 3.7 % of sales were paid to Food Runners and Bussers, after the Aloha system (post December 28, 2011) 5.0% of sales were paid to them. Cabrera Affidavit at para. 8-10 ; Recio Affidavit at para. 19-21. This change led to numerous complaints by Servers and Bartenders that they were not earning enough money and that they earned more money from the prior owners. Id.

Many Servers and Bartenders were unhappy with the credit card receipt change and the counseling as to the TAGGING OF CHECKS. Recio Affidavit at para. 13-16. They complained the amount of their tips were reduced by the additional disclosure on the receipt. They complained they were making less money and were quite unhappy. In some instances this unhappiness severely affected their attitude and work performance. Id.

The method by which Servers and Bartenders were paid by Monty's Sunset caused them to be exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act pursuant to section 207(i) thereof. Johnson Affidavit at para. 44. No claim is made in this action for Minimum Wage or Overtime Compensation. Plaintiffs Complaint.

Monty's Sunset utilized a time recording system that required all employees to log on prior to beginning work and to log off when they stopped working. That system calculated employee time worked to the minute. Exhibit B to Johnson Affidavit (time records); Johnson Affidavit at para. 40; Recio Affidavit at para. 64; Diaz Affidavit at para. 36. No Plaintiff complained about the accuracy of the time records maintained by Monty's Sunset or in any way suggested they worked more hours than were recorded for them. Johnson Affidavit at para. 42; Recio Affidavit at para. 63; Diaz Affidavit at para. 37.

For the week beginning September 23, 2011, Managers were evaluating employees, new employees were being hired and trained, and Managers were addressing personnel needs and scheduling matters. Most employees worked a full schedule during this first week. During the first week of operations Mr. Recio began preparing work schedules for employees for the upcoming weeks. Recio Affidavit at para. 38-41. Mr. Recio considered Ms. Diaz a valuable resource in his preparation of work schedules and determining the number of shifts to provide employees by virtue of her prior service as a Manager for RMI and her familiarity with the abilities of the Servers and Bartenders. Recio Affidavit at para. 44. Through consultation with Ms. Diaz regarding Plaintiff Locobara, Mr. Recio was provided mixed reviews and decided to initially limit the number of shifts worked by her to personally assess her capabilities. Recio Affidavit at para. 40.

When Plaintiff Locobara saw her schedule she was unhappy with her shifts and verbally complained to Managers, including Mr. Recio and Ms. Diaz. Diaz Affidavit at para. 33. Plaintiff Locobara's complaints to Mr. Recio and Ms. Diaz were that she was not making as much money as she had with RMI and she needed to make more money. Recio Affidavit at para. 42; Diaz Affidavit at para. 30.

All of the complaints of Plaintiff Locobara were verbal. She never put any complaint in writing. Johnson Affidavit at para. 38; Recio Affidavit at para. 36; Diaz Affidavit at para. 30. In response to Mr. Recio and other Managers telling her they were not sure if she would get more shifts, Plaintiff Locobara responded - don't bother- and she never came back to work. Recio Affidavit at para. 43-44.

During the approximate one month period Plaintiff Locobara worked for Monty's Sunset she worked the following hours and was paid the following amounts:

| Pay Period Ending | Hours | Total Pay | Pay Per Hour |
|---|---|---|---|
| October 2, 2011 | 58.62 | $1,119.91 | $19.10 |
| October 16, 2011 | 48.23 | $715.49 | $14.83 |
| October 30, 2011 | 12 | $286 | $23.83 |

Exhibits B and C to Johnson Affidavit.

It was the policy of Monty's Sunset to consider any employee who was a NCNS as having abandoned their job. Exhibit C to Powell Affidavit; Johnson Affidavit at para. 20; Recio Affidavit at para. 28; Diaz Affidavit at para. 42; Cabrera Affidavit at para. 32. The Monty's Sunset policy regarding NCNS (no call no show) is set forth in the Monty's Raw Bar Rules, Policies, Menu Specs. That policy supplements the Monty's Sunset Employee

Handbook. A copy of that document is attached to the Affidavit of Laurie Powell as Exhibit C. In that Policy it addresses Attendance and Tardiness. At p. 2 in bold capital lettering it informed employees:

**IF YOU ARE ABSENT FROM A SHIFT WITHOUT NOTICE YOU WILL HAVE BEEN CONSIDERED TO HAVE RESIGNED.**

Monty's Sunset terminated 16 employees for NCNS and all were considered to have abandoned their jobs as a result thereof. Johnson Affidavit at para. 21; Recio Affidavit at para. 30. Of the 16 employees who were terminated for NCNS, 7 had no prior disciplinary action of any kind. Id.

Plaintiff Watson was terminated for NCNS. Superbowl Sunday is an extremely busy day at Monty's. Affidavit of Irina Zevallos (the Zevallos Affidavit") Exhibit 7 hereto at para. 19; Diaz Affidavit at para. 53; Cabrera Affidavit at para. 35. Well in advance of Superbowl Sunday Monty's notified all employees that they will be required to work. Zevallos Affidavit at para. 19; Diaz Affidavit at para. 54; Cabrera Affidavit at para. 35. Plaintiff Watson was scheduled to work February 5, 2012, Superbowl Sunday. Id. Plaintiff Watson was notified in advance of that shift and was aware she was on the schedule for that day. Zevallos Affidavit at para. 19; Cabrera Affidavit at para. 35-38.

Several days after Plaintiff Watson saw she was on the schedule for Superbowl Sunday she asked Ms. Zevallos to be removed from the schedule. Zevallos Affidavit at para. 19. Ms. Zevallos refused to remove Plaintiff Watson from the schedule explaining all employees (with one exception) were required to work that day. Zevallos Affidavit at para. 19. Knowing that she was scheduled to work that day, Plaintiff Watson failed to appear for work. Zevallos Affidavit at para. 19; Cabrera Affidavit at para. 36. Instead of working on February 5, 2012, Plaintiff Watson went to the Circus with her Boyfriend. Zevallos Affidavit at para. 19; Cabrera Affidavit at para. 38. Consistent with its NCNS policy, Plaintiff Watson was considered to have abandoned her job as the result of a NCNS for her failure to appear for a scheduled shift and was removed from all subsequent schedules. Id.

Plaintiffs complained verbally to Managers, with all such verbal complaints relating to (i) the credit card fees, (ii) the allocation of the Service charge among Bartenders, Bussers, and Food Runners, (iii) requiring employees to be on call to work a double shift if needed, (iv) the new uniforms, (v) problems with newly hired employees, and (vi) that they were making less money than they had previously. Recio Affidavit at para. 36; Diaz Affidavit at para. 30; Cabrera Affidavit at para. 13-15, 20.

Managers informed ownership of the employee complaints, that many employees had poor attitudes, and that customer service was being negatively affected. Recio Affidavit at para. 35; Johnson Affidavit at para. 37; Cabrera Affidavit at para. 22. The owners informed the Managers that they were not going to change the amount or method by which employees were paid and that Managers should make that clear to employees. Johnson Affidavit at para. 39; Cabrera Affidavit at para. 23. Managers were also instructed to counsel employees with poor attitudes and so that customer service is not affected. Managers were told that employees who could not accept the way they were paid or who could not change their attitude should be asked to leave. Id.

During November 2011, Nina Zevallos was hired as a Manager. Zevallos Affidavit at para. 3. Mr. Cabrera and Ms. Zevallos met with Plaintiff Barquin to discuss her unhappiness and poor work attitude. Zevallos Affidavit at para. 10; Cabrera Affidavit at para. 24. At the meeting with Plaintiff Barquin they discussed her complaints and

unhappiness. Plaintiff Barquin reiterated her concern she was not making enough money, and repeated that she was making more money prior to September 23, 2011. She attributed this to deductions from the 18% of sales she was paid. She believed the credit card fees were too high and too much was paid to Bussers and Food Runners. She also did not like the new uniforms and could not accept being on call for a second shift if needed and did not like the new chef. She made it clear she would not accept these changes and her attitude would not improve. Zevallos Affidavit at para. 11-13; Cabrera Affidavit at para. 25-26 .

After Mr. Cabrera and Ms. Zevallos listened to Ms. Barquin and explained Monty's position, Ms. Barquin again responded that she could not accept these changes and could not be happy working under those conditions. Mr. Cabrera and Ms. Zevallos concluded it was apparent that it was impossible for Ms. Barquin to be happy in her job and that it was best for all concerned for her to find a job elsewhere where she could be happier. Zevallos Affidavit at para. 13; Cabrera Affidavit at para. 26.

Mr. Cabrera and Ms. Zevallos also met with Plaintiff Telsie to discuss her attitude and performance. Zevallos Affidavit at para. 14; Cabrera Affidavit at para.27. At that meeting Plaintiff Telsie discussed her complaints and unhappiness. She emphasized she did not think she was earning enough money. This is a complaint she and other employees had made numerous times. She was upset about not being allowed to leave early if it was slow, and complained about the credit card fees. Zevallos Affidavit at para. 15; Cabrera Affidavit at para. 28.

After listening to Ms. Telsie Mr. Cabrera explained to her the things that concerned her were not going to change. He explained that the owners had given these matters considerable thought and decided that this is how they wish to run their business. That just because things were different in the past and that she felt she should earn more money did not mean they could not be changed. Ms. Telsie refused to accept that the owners had the right to change things whether she liked it or not, and said she could not continue to work for this money. Id. It was apparent that it was impossible for Ms. Telsie to make the money she said she had to make. Mr. Cabrera concluded it was best for all concerned for her to find a job elsewhere where she could make the money she said she had to make. Zevallos Affidavit at para. 15; Cabrera Affidavit at para.30.

In Plaintiff's Interrogatory Responses, Exhibit 2 hereto, to Interrogatory No. 5 relating to the complaints they made and the retaliation they allege occurred, they each responded as follows:

**Plaintiff Barquin**

complained to Martin Cabrera (General Manager) "... about the high credit card fees and high tip outs.", to Amanda Diaz (Manager) "...various servers complained to her about high credit card fees.", to Nina Zevallos (Manager) "... I complained to her about the high credit card fees and high tip outs.", and to Christian (Manager) and Steve Neibler (Manager) " I complained to him about the high credit card fees and high tip outs.".

**Plaintiff Locobara**

complained to Michelle (manager), Amanda (manager), and James (manager) "... about the high credit card fees."

**Plaintiff Watson**

complained to Martin Cabrera (General manager) and Nina Zevallos (Manager) "... about the high credit card fees and about the manner in which I was paid.", to Amanda Diaz (Manager) "... about not being properly paid.", to Nina Zevallos (Manager) "... high credit card fees and about the manner in which I was paid.", to Christian (Manager) and to Steve Kneapler (Manager) "... about the high credit card fees and high tip outs.".

**Plaintiff Telsie**

complained to Martin Cabrera (General manager), Michelle (Manager), Amanda Diaz (Manager),

Tim (Manager), James (Manager) "about the high credit card fees tips, high tip outs, and the manner in which I was compensated.".

**Plaintiff Pena-Monsievich**

complained to Martin Cabrera (General manager), Michelle (Manager), Sean (Manager), Christo (General Manager) " … about being improperly paid.".

None of the concerns or complaints of Plaintiffs related to them earning less than $11.51 per hour or not being paid overtime. All Plaintiffs' complaints and concerns related to their not making as much money as they thought they should be or that they believed they had in the past. Johnson Affidavit at para. 42; Cabrera Affidavit at para. 20; Recio Affidavit at para. 36.

Defendant incorporates herein its Statement of Material Facts, Exhibit 9.

## III
## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact" and judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing, by reference to materials on record, that there are no genuine issues of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 320, 106 S. Ct. 2548, 2551 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). A moving party satisfies this burden by exposing an absence of evidence to support the non moving party's case. *Celotex,* 477 U.S. at 325. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). A "genuine" dispute as to a material fact only exists "if the evidence is such that a reasonable jury could return a verdict for the non moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

## IV
## FLSA PROTECTED ACTIVITY

The FLSA, 29 U.S.C. Sec. 215(a)(3), defines protected activity as:

> to discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted any proceeding **under or related to this chapter**, or has testified or is about to testify in any such proceeding … . {emphasis supplied}

The United States Supreme Court has recently provided guidance in determining if a verbal complaint is sufficient to constitute a protected activity under the FLSA. In Kasten v. Saint Gobain Performance Plastics Corp., 131 S. Ct. 1325,1334, 179 L. Ed. 2D 379 (2011), the United States Supreme Court described that which is necessary for a FLSA complaint of retaliation, holding:

> the phrase "filed any complaint" contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns.

The Supreme Court explained:

> [t]o fall within the scope of the anti retaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both the content and context, **as an assertion of rights protected by the statute** and a

call for their protection. {emphasis supplied}. Id.

In Kasten, the Supreme Court did not address whether the requisite complaint or grievance may be made to the employer or must be made to a governmental or other entity. In this instance Plaintiffs filed no complaint or grievance with any governmental entity. Their only complaints were verbal to their employer. Their failure to file a complaint or grievance with a governmental or other entity renders their complaints not protected. Id.

General work grievances are not complaints of activities protected by the FLSA. It is insufficient for an employee to merely complain in a general manner about wages and tips under the FLSA. *See*, Lambert v. Ackerley, 180 F.3d 997, 1007 (9th Cir. 1999)("Not all amorphous expressions of discontent related to wages and hours constitute complaints filed within the meaning of §215(a)(3)"); *See also*, Valerio v. Putnam Assoc., Inc., 173 F.3d 35, 43 (1st Cir. 1999)( "[t]here is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the [statute]…. "); Robinson v. Wal-Mart Stores, Inc., 341 F. Supp. 2d 759 (W.D. Mich. 2004)("[P]laintiff's expressions of concern or discomfort or frustration over her employer's wage and work hour reporting practices – even accepting her deposition testimony as true – do not amount to requisite adversarial assertion of statutory rights"); Brown v. Triton Sec., 5005 WL 2708914 (E.D. Va. 2005)("In lodging such complaints, Brown merely expressed his dissatisfaction with the terms of his employment-at-will status. Such complaints are not protected activity.")

Verbal complaints satisfying both the formality and specificity requirements of Kasten will constitute FLSA protected activity only if the following two requirements are satisfied:

> (1) the employee must show that he **subjectively**, that is in good faith, believed that his employer was violating the law. Little v. United Techs. Carrier Transicold Div., 103 F. 3d 956, 960 (11th Cir. 1997) (decided under Title VII anti-retaliation provision), and
>
> (2) that he had an "**objectively reasonable** belief that his employer was engaged in unlawful practices." (Title VII). Padilla v. The North Broward Hosp. Dist., 270 Fed. Appx. 966 (11th Cir. 2008). [emphasis supplied].

**A. PLAINTIFFS COMPLAINTS WERE NOT PROTECTED AVTIVITY**

In determining whether the actual verbal complaints made by Plaintiffs constitute protected activity under the FLSA, the context of those complaints as well as the reasonableness of those complaints "... in light of the facts and the record presented." must be considered. Little, 103 F. 3d at 960. When so considered, Plaintiffs complaints fall far short of "fair notice" that a FLSA grievance has been lodged and lack the requisite clarity and detail to put a reasonable employer on notice of a FLSA grievance. Kasten, 131 S. Ct. at 1334.

The specific complaints made by Plaintiffs (discussed below) in the context of the method and amount Plaintiffs were paid by Defendant (discussed below) demonstrate Plaintiffs neither had the subjective good faith nor the objective reasonableness required for their complaints to rise to the level of protected activity. In the cases discussed below summary judgment was granted in favor of the defendant based on the plaintiff not having engaged in protected activity.

In Alvarado v. I.G.W.T. Delivery Systems, Inc., 401 F. Supp. 2D 1272, 1278 (S.D. Fl. 2006) (letters signed by plaintiffs requesting an increase in salary, reorganization of routes, cessation of discriminatory comments on the

job, and increased courtesy and respect insufficient to constitute protected activity). In Burnette v. Northside Hospital, 342 F. Supp. 2d 1128 (N.D. Ga. 2004) (employee complaining about a change in on call policy resulting in the loss of on call pay insufficient to constitute protected activity). In Perez v. Brandsmart Derv. Corp., 2011 U.S. Dist. Lexis 82708, 25 (S.D. Fl. 2011) (employee complaining to human resources and to his supervisors that he would not work for free insufficient to constitute protected activity). In Ash v. Sambodromo, 676 F. Supp. 2D 1360, 1372 (S.D. Fl. 2009) (protected activity not found where "[s]hortly after plaintiff complained to Defendant about illegal tip deductions Defendant retaliated against her by terminating her ..."). In Ash, in addition to illegal tip pooling plaintiff complained about high credit card fees. Id.

One common thread in the aforediscussed cases is that the plaintiffs never specifically mentioned the minimum wage or asserted rights under the FLSA. Ash, 676 F. Supp. 2d at 1374 ("... nowhere in the plaintiff's vague statements to management does the plaintiff assert her rights under the FLSA."). The same is true in this case.

Comparing the complaints Plaintiffs contend they made with those of Mr. Perez, Ms Ash, and Mr. Alvarado, it is apparent Plaintiffs' complaints fall far short of protected activity. The totality of the complaints each Plaintiff contends they made are set forth in their Response to Defendant's Interrogatories (Exhibit 2 hereto), wherein they admit: **Plaintiff Barquin** : "... about the high credit card fees and high tip outs.", "...various servers complained to her about high credit card fees.", "... I complained to her about the high credit card fees and high tip outs.", and " I complained to him about the high credit card fees and high tip outs.". **Plaintiff Locobara:** "... about the high credit card fees.". **Plaintiff Watson:** "... about the high credit card fees and about the manner in which I was paid.", "... about not being properly paid.", "... high credit card fees and about the manner in which I was paid.", "about the high credit card fees and high tip outs.". **Plaintiff Telsie:** "about the high credit card fees tips, high tip outs, and the manner in which I was compensated.". **Plaintiff Pena-Monsievich:** " … about being improperly paid.". Exhibit 2 hereto (Plaintiffs response to Defendant's First Interrogatories, Interrogatory No. 5).

Assuming the aforequoted sworn Interrogatory responses of Plaintiffs are correct and accurate, the litany of Plaintiffs' complaints are noteworthy for their complete absence of any reference to the FLSA, to the minimum wage or to overtime compensation. No reasonable interpretation of those complaints could lead a reasonable employer to conclude Plaintiffs were lodging or filing a grievance under the FLSA. See, Kasten, 131 S. Ct. at 1334. Verbally informing your employer that it is your opinion the credit card fees are too high is by no means the lodging or filing of a grievance under the FLSA. Verbally informing your employer that it is your opinion the tip outs were too high is by no means the lodging or filing of a grievance under the FLSA. The complaints about high tip outs and high credit card fees made by Plaintiffs herein are no different than those found not protected in Ash, 676 F. Supp. 2d at 1372-74.

The other complaints made only by Plaintiffs Watson, Telsie and Pena-Monsievich (not Plaintiffs Barquin or Locobara), assuming they were made - "the manner in which I was paid" and "not being properly paid" are simply to vague to constitute protected activity. Are these complaints Plaintiffs were not making enough money? Are these complaints Plaintiffs would rather be paid an hourly wage than a percentage of sales? Are these complaints Plaintiffs would rather be paid a salary than a percentage of sales? Are these complaints Plaintiffs would

rather be paid a greater percentage of their sales? Are these complaints Plaintiffs would prefer to have the deductions from their net sales reduced? Are these complaints Plaintiffs would rather have a higher guaranteed wage? Are these complaints Plaintiffs were not paid the guaranteed wage? Are these complaints Plaintiffs believe a mathematical error or miscalculation occurred in the calculation of their pay? Are these complaints Plaintiffs believe some law other than the FLSA controls their pay and has been violated? Whatever these complaints may be, they do not "arise under or relate to" the FLSA. 29 U.S.C. Sec. 215(a)(3).

Complaints of this nature - requiring an employer to guess or speculate as to the substance of the grievance - are by definition outside the scope of protected activity. Kasten, 131 S. Ct. at 1334, "... a complaint must be sufficiently clear and detailed for a reasonable employer to understand it...".

**B. IF PLAINTIFFS' COMPLAINTS WERE PROTECTED ACTIVITY, THEY WERE NEITHER REASONABLE NOR MADE IN GOOD FAITH**

The FLSA addresses **only** claims for minimum wage, 29 U.S.C. Sec. 206(a), and overtime compensation, 29 U.S.C. Sec. 207(a). FLSA protected activity must therefore be limited to those specific rights (29 U.S.C. Sec. 215(a)(3) "... under or related to this chapter **...**") . Plaintiffs recognize this at Paragraph 12 of their Complaint, where they allege:

> Shortly before they were fired, Plaintiffs complained to the Employer that it was violating the **minimum wage and overtime provisions of the FLSA**. {emphasis supplied}

Assuming, arguendo, the above quoted allegation is correct, which as demonstrated above it is not, those complaints were neither reasonable nor made in good faith.

The Federal Minimum Wage at all times material hereto was $7.25 per hour. 29 U.S.C. Sec. 206(a). Plaintiffs were notified of this by the FLSA Poster prominently displayed in the restaurant's kitchen where schedules were posted. Johnson Affidavit at para. 15; Recio Affidavit at para. 18; Cabrera Affidavit at para. 17. Defendant paid Plaintiffs not less than $11.51 per hour. Exhibit B to Affidavit of Laurie Powell (Monty's Sunset Employee Handbook, p. 5); Exhibit C to Affidavit of Tricia Johnson (payroll records of Plaintiffs).

No reasonable employee who had any awareness of the amount of the Federal Minimum Wage ($7.25 per hour) who was guaranteed to earn not less than $11.51 per hour (in excess of 150% of the minimum wage) could in good faith approach his or her employer to complain about not being paid the minimum wage in violation of the FLSA. Even if Plaintiffs made that complaint, which they admittedly did not and which would be quite nonsensical under the circumstances, they could not have subjectively in good faith believed that such was the case. Perez, 2011 U.S. Dist. Lexis 82708, 25-26.

Not only could Plaintiffs not subjectively in good faith believe they were not paid the minimum wage, they could not have objectively had a reasonable belief Defendant was not paying them the minimum wage. In resolving this issue it is presumed the employee has substantive knowledge of the law, i.e. the amount of the minimum wage. Little v. United Techs. Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) (decided under Title VII anti-retaliation provision). This is especially so where the employer displays the required FLSA Poster informing employees of the amount of the Federal Minimum Wage. Johnson Affidavit at para. 15; Recio Affidavit at para. 18; Cabrera Affidavit at para. 17. This Court must ask- How could employees making a guaranteed minimum hourly

pay of $11.51 reasonably believe they were making less than the $7.25 minimum wage?

The unreasonableness of Plaintiffs belief they were not paid the minimum wage finds additional support when considered in light of the actual wage payments made to Plaintiffs. The time and payroll records of plaintiffs are Exhibits B and C to the Johnson Affidavit. Plaintiff Barquin earned not less than $11.94 per hour or 164% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $16.11 per hour or 222% of the minimum wage. Affidavit of James Recio, para. 46. Plaintiff Watson earned not less than $11.51 per hour or 160% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $17.45 per hour or 240% of the minimum wage. Affidavit of James Recio, para. 47. Plaintiff Telsie earned not less than $12.32 per hour or 169% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $17.37 per hour or 239% of the minimum wage. Affidavit of James Recio, para. 51. Plaintiff Locobara earned not less than $14.83 per hour or 204% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $17.84 per hour or 246% of the minimum wage. Affidavit of James Recio, para. 56. Plaintiff Pena-Monsievich earned not less than $14.89 per hour or 204% of the minimum wage during her entire period of employment, with her average pay for her entire employment with Monty's Sunset being $16.30 per hour or 224% of the minimum wage. Affidavit of James Recio, para. 60.

This question is answered by Perez, 2011 U.S. Dist. Lexis 82708, 16, (the plaintiff was paid on a commission basis, was guaranteed the minimum wage for all hours worked, and never worked overtime hours). Notwithstanding almost identical, but less compelling facts than those herein, summary judgment was entered for the defendant by Judge O'Sullivan holding:

> … the plaintiff in the present case cannot satisfy the objectively reasonable requirement. **Even if the plaintiff did not know that BrandsMart guaranteed him minimum wage for all hours worked, it is an undisputed fact.** The applicable law allows commission payments to cover any hours spent for the benefit of the employer, regardless of how those hours are spent. **The FLSA does not prohibit an employer from changing or increasing job duties, hours or assignments, as long as the employee receives at least minimum wage for all compensable hours. The plaintiff's complaints were not objectively reasonable and thus, cannot constitute protected activity.** {emphasis supplied}.

Id. at 30. According to Perez it is irrelevant whether the employee even knows of the wage guaranty. All that is necessary is the employee be guaranteed and actually paid the minimum wage. In this case Plaintiffs were not only guaranteed the minimum wage, they were guaranteed in excess of 150% of the minimum wage, and were told of this in the Employee Handbook. Exhibit B to Affidavit of Laurie Powell. There is no issue Plaintiffs were paid not less than the guaranteed amount each work week. Exhibit B and C to Johnson Affidavit (Plaintiffs payroll and time records).

Interestingly, Plaintiff Watson (check dated November 4, 2011) and Plaintiff Telsie (check dated February 10, 2012) were paid an additional amount as a Labor Difference to assure they made the guaranteed wage of $11.51 per hour. Affidavit of James Recio, para. 48, 52; Exhibit C to Johnson Affidavit. Both Plaintiffs accepted the additional payment without question or objection. Affidavit of James Recio, para. 49, 53. How can an employee claim ignorance of the wage guaranty when their pay stub shows they are being paid such amount?

It is well known the FLSA requires overtime compensation for non-exempt employees who work in excess of forty (40) hours per work week. 29 U.S.C. Sec. 207(a). Employees who work in excess of forty (40) hours per week and who are not exempt must be paid time and one-half of their regular rate of pay for their hours in excess of forty (40). Id. Employees who are exempt, as Plaintiffs herein, need not be paid overtime compensation. 29 U.S.C. Sec. 207(i).

Only Plaintiffs Barquin and Watson worked overtime. This was during only two weeks for Plaintiff Barquin and one week for Plaintiff Watson (.84 overtime hours). Exhibit B to Johnson Affidavit (time records of Plaintiffs). Because Plaintiffs (other than Barquin and Watson) never worked over forty hours a week, they could not subjectively in good faith believe they were entitled to and not paid overtime compensation. See, Perez, 2011 U.S. Dist. Lexis 82708, 26. Even if Plaintiffs did for some reason believe they should be paid overtime despite not working in excess of forty (40) hours in a work week, that belief could not have been objectively reasonable. It is presumed the employee has substantive knowledge of the law, i.e. that to be entitled to overtime they must work in excess of forty hours in a work week. Little v. United Techs. Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) (decided under Title VII anti-retaliation provision). This Court must ask- How could an employee working fewer than forty (40) hours per work week possibly believe they were entitled to overtime compensation? Cf., Harper v. Blockbuster Ent. Corp., 139 F. 3d 1385, 1388 n. 2 (11th Cir. 1998) (holding employees' belief that grooming policy violated Title VII was unreasonable given the overwhelming federal case law upholding such policies, and rejecting employees' argument that charging them with knowledge of case law was unfair: "If the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge."); Burnette v. Northside Hosp., 342 F. Supp. 2d 1128,1134-35 (N.D. Ga. 2004) ("... belief that Northside's conduct violated the **FLSA** was not reasonable, his complaint concerning on call-pay was not **protected activity**").

As for Plaintiffs Barquin and Watson, the record is clear they never complained they were not paid overtime or even requested overtime. Exhibit 2. Complaining about not making enough money or about high credit card fees is not filing of a complaint or grievance under the FLSA for unpaid overtime pay.

There is no doubt Plaintiffs were exempt form the overtime provisions of the FLSA. 29 U.S.C. Sec. 207(i). That exemption provides that employees who work for a retail or service establishment who are paid on a commission basis and whose commissions exceed 50% of their compensation are exempt if they earn not less than 150% of the minimum wage. Id. Qualification for this overtime exemption is the reason Monty's Sunset guaranteed Plaintiffs would earn not less than 150% of the minimum wage, and is presumably the reason this action does not seek the recovery of overtime compensation for Plaintiffs Barquin and Watson.

As a result of the FLSA 207(i) exemption, even if Plaintiffs Barquin and Watson did complain about not being paid overtime, which they did not, that complaint would not be protected activity under the FLSA. A complaint of that nature would not be subjectively or objectively reasonable. Harper, 139 F. 3d at 1388 n. 2; Burnette, 342 F. Supp. 2d at 1134-35; Perez, 2011 U.S. Dist. Lexis 82708, 16. Since Plaintiffs are charged with knowledge of the law, Little, 103 F. 3d at 960, their filing a complaint or grievance for overtime would not be in good faith or reasonable due to their being exempt from the FLSA overtime requirements.

Plaintiffs were at all times aware of the number of hours they worked. Each and every paycheck and pay stub given to Plaintiffs showed their hours worked. Johnson Affidavit at para.41. In addition to being informed of their hours on their pay stubs, the computer time recording system allowed Plaintiffs while logged on to review their hours worked for the entire week. Johnson Affidavit at para. 40. Regardless of whether Plaintiffs are charged with sufficient knowledge of the FLSA to understand they were exempt from overtime pursuant to 29 U.S.C. Sec 207(i), they must be charged with knowledge of the relevant facts as relate to them. The relevant fact being - the number of hours worked by them were less than 40.

Plaintiffs either knew or should have known the number of hours worked by them. Charged with this knowledge they could not have reasonably lodged or filed a complaint for overtime pay.

It must be emphasized that no Plaintiff has even intimated they complained about working overtime and not being paid for those hours. Plaintiffs can not be retaliated against under the FLSA for a complaint they did not make. The complaints Plaintiff Barquin did make were: "... about the high credit card fees and high tip outs.", "...various servers complained to her about high credit card fees.","... I complained to her about the high credit card fees and high tip outs.", and " I complained to him about the high credit card fees and high tip outs.". Exhibit 2 hereto (Plaintiffs Interrogatory Responses). No reasonable employer could interpret the aforequoted complaints as relating to not being paid overtime for hours worked in excess of forty per week. Kasten, 131 S. Ct. at 1334.

Presumably, if Plaintiffs had any basis to conclude they worked overtime and were not properly paid for those hours this action would include a claim for overtime compensation. It does not.

Because Plaintiffs could not have reasonably or in good faith complained about minimum wage or overtime compensation, the complaints they did make were not protected under the anti-retaliation provisions of the FLSA.

There is no doubt Plaintiffs did verbally complain. They complained about about not making enough money. Not a complaint under the FLSA. Perez, 2011 U.S. Dist. Lexis 82708, 25 (not working for free). They complained about credit card fees being deducted from the 18% of net sales paid to them. Not a complaint under the FLSA. Ash, 676 F. Supp. 2d at 1372. They complained about amounts paid to Food Runners and Bussers being deducted from the 18% of net sales paid to them. Not a complaint under the FLSA. Id. They complained about having to disclose to customers that the guest check included an 18% Service Charge. Not a complaint under the FLSA. They complained about not getting enough shifts. Not a complaint under the FLSA. The complained about the change in the way credit card receipts were prepared to show the customer the amount of the Service Charge on that receipt. Not a complaint under the FLSA.

## V
## IF PLAINTIFFS ENGAGED IN PROTECTED ACTIVITY, THERE IS NO CONNECTION BETWEEN THAT ACTIVITY AND THEIR TERMINATION

Even assuming *arguendo* each Plaintiff engaged in a protected activity, they cannot and have not established a causal connection between their alleged protected activity and their loss of employment. Plaintiffs Watson, Locobara and Pena-Monsievich were each treated as having resigned due to their NCNS (no call no show). Cabrera Affidavit at para. 36 ; Recio Affidavit at para.44, 62 ; Zevallos Affidavit at para.19. Considering an employee as resigning for NCNS was a well established policy of Defendant. Exhibit C to Powell Affidavit; Johnson Affidavit at para. 20; Cabrera Affidavit at para. 32 ; Recio Affidavit at para. 28; Zevallos Affidavit at para.

16-18. The reason Plaintiffs Watson, Locobara and Pena-Monsievich stopped working for Defendant was their failure to appear for work when scheduled, not the vague, informal complaints they made about not making enough money. Id. The NCNS policy is set forth in Exhibit C to the Powell Affidavit, and at p. 2 states:

> **IF YOU ARE ABSENT FROM A SHIFT WITHOUT NOTICE YOU WILL HAVE BEEN CONSIDERED TO HAVE RESIGNED.**

The failure of Plaintiffs Watson (to attend the Circus with her boyfriend), Locobara (because not making enough money) and Pena-Monsievich to appear for work is no different than Mr. Perez' refusing to perform assigned tasks. Perez, 2011 U.S. Dist. Lexis 82708, 25. In each instance, not showing up for work herein and refusing to perform assigned duties in Perez, such defiant activity cannot be considered "filing a complaint" within the meaning of the anti-retaliation provisions of the FLSA. An old labor law adage illustrates this distinction, "work now, grieve later." While the grievance may be protected; insubordination is not. That distinction becomes crucial as to the issue of pretext, because the ultimate issue is whether the employer was motivated because of the filing of a complaint.

To meet their ultimate burden of proving retaliation for protected activity, Plaintiffs must show the adverse action would not have been taken "but for" their assertion of FLSA protected rights. Banegas v. One Two Tree, Inc., 2010 U.S. Dist. LEXIS 81994, at*14 (S.D. Fla. August 12, 2010) (citing Wolf v. Coca-cola, 200 F.3d 1337, 1343 (11th Cir. 2000) (citations omitted)). This means that there must be admissible evidence from which a reasonable jury could find that "but for" Plaintiffs' complaints, they would remain in the employ of Defendant. In this instance Plaintiffs Watson, Locobara and Pena-Monsievich can not do so as there is no evidence to establish that had they appeared for work as scheduled they would not have continued to be employed by Defendant. They may not have liked it, they may have complained about not making enough money or the credit card fees, but so long as they did their jobs with a good attitude there is no reason to believe they would not still be employed by Defendant. All they had to do was show up as scheduled, which they chose not to do.

The consistent and longstanding application of Defendant's NCNS policy is not subject to question. The policy is written (Exhibit C to Powell Affidavit), was in effect before Defendant acquired the business (Powell Affidavit at para. 27-28), was continued when Defendant acquired the business (Johnson Affidavit at para. 20), and was consistently applied by Defendant to all NCNS's regardless of the employees prior disciplinary history (Johnson Affidavit at para. 21; Cabrera Affidavit at para. 33; Recio Affidavit at para. 30; Diaz Affidavit at para. 42-43; Zevallos Affidavit at para. 16-18).

Plaintiffs Barquin and Telsie were terminated by Defendant as a result of their her unhappiness and poor work attitude. Cabrera Affidavit at para. 26, 30; Zevallos Affidavit at para. 16-18. They allowed their unhappiness to negatively affect their job performance and were counseled for that. Id. During their meeting with the General Manager, Mr. Cabrera, and a Manager, Ms. Zevallos, Plaintiffs Barquin and Telsie refused to improve their attitudes and not let their unhappiness negatively affect their work. Id. Defendant therefore concluded counseling would not remedy the problem and there was no alternative but to suggest they find other employment. Id.

## VI
## THE CUSTOMERS WERE CUSTOMERS OF DEFENDANT AND PLAINTIFFS DID NOT HAVE A BUSINESS RELATIONSHIP WITH DEFENDANT'S CUSTOMERS

In Count II of the Complaint Plaintiffs allege they had "advantageous business relationships with their customers." Complaint at para. 12. They further allege Defendant interfered with that relationship resulting in their loss of "extra tips". Complaint at para. 13. Essentially Plaintiffs contend Defendant's actions interfered with Defendant's customers leaving Plaintiffs tips. Despite being factually incorrect, Plaintiffs simply have no cause of action for this alleged wrong.

To prove their claim Plaintiffs must show: (i) the existence of a business relationship, (ii) knowledge of the relationship on the part of defendant, (iii) an intentional and unjustified interference with that relationship by defendant, and (iv) damage as a result of the breach of relationship. Gregg v. U.S. Indus., Inc., 887 F. 2d 1462, 1473 (11th Cir. 1989); Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994). For the reasons set forth below Plaintiffs fail to establish a business relationship existed or that Defendant in any way interfered with any such relationship.

Plaintiffs are incorrect, the patrons of the restaurant were not their customers, they were Defendant's customers. Defendant owned and operated a restaurant to serve its customers. Defendant advertised to attract customers, purchased food to prepare for customers, and hired staff to serve customers. Plaintiffs were employed by Defendant to serve Defendant's customers subject to the direction and control of Defendant. Plaintiffs, by virtue of doing their jobs, did not establish a business relationship with any customer. Having no business relationship with Defendant's customers, Plaintiffs can not establish an essential element of their claim.

Because restaurant customers were those of Defendant, there can be no doubt a business relationship existed between Defendant and its customers. The business relationship between Defendant and its customers precludes any claim of tortuous or other interference even if Plaintiffs did have a business relationship with Defendant's customers. Cox v. CSX Intermodial, Inc., 732 So. 2d 1092 (Fla. 1st DCA 1999); Romika-USA, Inc. v. HSBC Bank USA, N.A., 517 F. Supp. 2d 1334, 1338 (S.D. Fla. 2007). The "... interfering defendant must be a third party, a stranger to the business relationship."; Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F. 3d 1285, 1294 (11th Cir. 2001). Defendant is far from a "stranger" or "third party" with respect to the customers of its restaurant.

The employment relationship between Plaintiffs and Defendant allowed Defendant to require the "Tagging of Checks" and to require Manager approval of tips. Exhibit B to Powell Affidavit at p. 6 provided:

> TAGGING CHECKS
> An automatic 18% Service Charge is included in each check, with the exception of "To Go" orders which is automatic 10%. You are not allowed to add an extra service charge to the check or tell the guest that the service charge is not included. If a guest wants to leave an extra service charge, you must advise your immediate supervisor and have him/her authorize the extra service charge while the customer is still on the premises. Failure to follow this procedure will result in forfeiture of the extra service charge.

One reason for the Tagging Checks policy and the December 28, 2011, change to the Aloha system to disclose the Service Charge on the credit card receipt as well as the guest check was customer complaints and charge backs. Customers would mistakenly or erroneously leave a large tip not realizing an 18% Service Charge was added to the check. Johnson Affidavit at para. 29-31; Recio Affidavit at para. 12-16. When the customer later realized this they would call to complain and want a refund. Id. In an effort to maintain good relations with its customers and to avoid instances of over tipping Defendant made appropriate and necessary changes. Id. All enforcement of the

Check Tagging policy and changes made to the credit card receipts were reasonable business decisions to designed to protect Defendant's financial interests. Id.

By accepting employment under such terms and conditions and continuing in Defendant's employ Plaintiffs agreed to such policy. Defendant can not be precluded from enforcing a necessary and reasonable policy because its employees believe they are entitled to receive mistakenly large or erroneous tips from Defendant's customers. Defendant's express right to control the situation in which tips are given by Defendant's customers to Servers and Bartenders precludes any claim of interference. McCurdy v. J. C. Collis, 508 So. 2d 380, 384 (Fla. 1st DCA 1987).

By enforcing its Check Tagging policy Defendant sought to protect and safeguard its financial relationship with its customers. Johnson Affidavit at para. 29-31; Recio Affidavit at para. 12-16. Safeguarding its relationship with customers and enforcing the check Tagging requirements stated in the Employee Handbook were done solely to protect Defendant's financial interests and were done through proper means. Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc., 162 F. 3d 1290, 1321 (11th Cir. 1998). As such, Defendant's actions were privileged. Id. at 1322.

Plaintiffs' contention Defendant interfered with their tips finds no factual support. In addition to the amount paid to Servers and Bartenders by Monty's Sunset, Servers and Bartenders were given tips by customers. Servers and Bartenders would receive both credit card tips and cash tips. Recio Affidavit at para. 10; Diaz Affidavit at para. 46; Zevallos Affidavit at para. 20 . When a tip would be given to a Server or Bartender they would keep that tip. I am not aware of any circumstance where a customer was prohibited from leaving a tip. Johnson Affidavit at para. 35; Recio Affidavit at para. 11; Diaz Affidavit at para. 46; Zevallos Affidavit at para. 21. Aside from enforcing its reasonable tipping policies, no Server or bartender was ever prohibited from getting a tip. In fact, Monty's Sunset was pleased to have customers reward superior service with a tip. Monty's did have a concern that customers were mistakenly leaving tips not realizing the guest check included an 18% Service Charge. Johnson Affidavit at para. 34.

Interestingly, Plaintiffs' Interrogatory answers, Exhibit 2, fails to even intimate that complaints were made or problems existed with respect to Defendant's interference with their receipt of tips from customers. Apparently it must not have been a concern to Plaintiffs worthy of note.

## VII
## CONCLUSION

For the reasons set forth herein Defendant's Motion must be Granted. Plaintiffs did not engage in any FLSA protected activity. Their complaints were not related to the FLSA and were nothing more than vague grievances about their not making enough money.

Plaintiffs could not have subjectively in good faith believed Defendant was violating the FLSA and certainly could not have had an objectively reasonable belief the FLSA was being violated. No reasonable employee who was acting in good faith and reasonably would complain the were not being paid the $7.25 minimum wage when guaranteed a wage of not less than $11.51 per hour. No reasonable employee who was acting in good faith and reasonably would complain they were not paid overtime if they worked fewer than 40 hours per week.

It is reasonable to expect Plaintiffs to have knowledge of certain employment related facts as relate to them.

Those facts being the number of hours they worked. In this instance it was right before their eyes every time they logged on to the computer to begin work and when they logged out. A week to date accounting of their hours to the minute. Plaintiffs were also shown the number of hours they worked on their pay stub. There is thus no reason for Plaintiffs to be unaware of their hours and thus to ask for or complain about overtime. Plaintiffs Barquin and Watson who did work overtime by her sworn Interrogatory answers admit they never complained about overtime.

Plaintiffs were not terminated in retaliation for any complaints they made. Consistent with Defendants long standing policy of treating NCNS as resignations, Plaintiffs Watson, Locobara, and Pena-Monsievich resigned due to their failure to appear for a scheduled shift. This policy was consistently administered both before and after Defendant acquired the restaurant. There is simply no causation between any protected activity and these terminations. As for Plaintiffs Barquin and Telsie they were each terminated due to poor attitudes affecting their job performance. Defendant attempted to counsel them but concluded they would be unable to perform their jobs with an acceptable attitude and agreed it best for them to leave.

As to Count II, Plaintiffs simply did not have a business relationship with Defendant's customers. Plaintiffs were Defendant's employees, serving Defendant's customers, no more no less. It was Defendant who had a business relationship with its customers. As a result of that business relationship Defendant was not a stranger or third party with respect to its customers and therefore can not have interfered with Plaintiffs relationship with those customers. Additionally, all actions taken by defendant were reasonable and in furtherance of its financial interests.

Defendant's Motion must therefore be Granted and Judgment must accordingly be entered for Defendant.

**DATED THIS 8th** day of July, 2013.

Respectfully submitted,

**LAW OFFICES OF DONALD J. JARET, P.A.**
*Counsel for Defendant*
2790 La Bella Ct..
Henderson, NV. 89052
Tel: (305) 740-3383
Fax: (305) 390-8728

BY: s/ DONALD JARET
Donald J. Jaret, Esq.
Florida Bar No. 296163

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 8, 2013, I electronically filed the foregoing document with the Clerk using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Filing.

S/ Donald Jaret
DONALD J. JARET